## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

**STEFAN PASSANTINO**,
c/o Binnall Law Group
717 King Street, Suite 200
Alexandria, Virginia 22314,

     *Plaintiff,*

**v.**

**UNITED STATES OF AMERICA**,

     *Defendant.*

Case No.: _____

**JURY TRIAL DEMANDED**

## <u>COMPLAINT</u>

1.     In or around December of 2022, the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Committee"), through its members and staff, chose to bring the full weight and credibility of Congressional authority against a private citizen, Stefan Passantino, to destroy his reputation and career. The Committee did so without ever contacting Mr. Passantino, without interviewing him, without providing him with notice of the claims against him, and without providing him with an opportunity to respond. This was in violation of law and the due process that should be afforded every American citizen and for the purpose of promoting a pre-ordained political and legal narrative against the forty-fifth President of the United States, Donald J. Trump.

2.     To promote its political and legal objectives, the Committee purposely and maliciously interfered in the attorney-client relationship between attorney Stefan Passantino and one of his clients, communicated with his client without his consent, generated a harmful narrative about that attorney-client relationship and the legal advice he gave his client, and, in concert with national cable news organizations, published private information and promoted that narrative.

3.     The Committee, which has proven itself time and time again to manipulate evidence in support of a bias against anyone associated with President Trump, had a deliberate goal to ruin Mr. Passantino because of a false assumption about his involvement in 2020 post-election activities, the role that he played as the chief ethics lawyer in President Trump's White House, and as an attorney for several former administration and campaign staff before the Committee.

4.     The Committee, through a backchannel directly to Mr. Passantino's client, in total disregard for the attorney-client relationship and Committee Members' and staffs' own ethical obligations as members of the bar, convinced Mr. Passantino's client to sit for additional interviews and give incredible testimony that could then be peddled by national news media friendly to the Committee to damage Mr. Passantino.

5.     Without providing any notice to Mr. Passantino or even contacting him to discern the veracity of the allegations lodged against him, the Committee, through its members or staff or both, leaked information to Cable News Network ("CNN"), Alyssa Farah Griffith, a highly compensated CNN political commentator, and possibly others, pertaining to Mr. Passantino and his representation of witnesses before the Committee to create a narrative that would injure Mr. Passantino. These leaks, which were wholly outside the Committee's constitutional and legal jurisdiction or any individual member's official legislative functions, resulted in serious personal damage to Mr. Passantino.

6.     The Committee gave an outrageous narrative to media sources about Mr. Passantino's non-existent efforts to obstruct their investigation by impacting the testimony of their "star" witness, Cassidy Hutchinson, to support its political narrative. The Committee knew or should have known that this was non-public information in which the public had no legitimate interest. Instead, the Committee deliberately violated Mr. Passantino's privacy and caused him significant economic, reputational, and emotional harm.

## PARTIES

7.     Plaintiff Stefan Passantino is an individual who is a citizen of the State of Georgia, who regularly represents clients in Washington, D.C., as an

attorney. At the time of the events and allegations in this Complaint, Mr. Passantino was counsel for a witness before the United States House of Representatives Select Committee to Investigate the January 6th Attack on the United States.

8.     Defendant United States of America includes the United States Congress and all government agencies and departments responsible for the wrongful acts of its employees acting within the scope or office of their employment while investigating the events of January 6 at the Capitol and bringing false allegations of Plaintiff and is sued under 28 U.S.C. § 1346 and 5 U.S.C. §§ 702–703.

## JURISDICTION AND VENUE

9.     This Court has original subject matter jurisdiction over Mr. Passantino's federal claims under 28 U.S.C. §§ 1331 and 1346(b)(1) because they arise under federal law and because the United States is a defendant.

10.     This Court is the proper venue pursuant to 28 U.S.C. § 1402(b) as Mr. Passantino resides in this District.

## FACTUAL BACKGROUND

### Background of the Parties

11.     From January 2017 until August 2018, Mr. Passantino served as Deputy White House Counsel, focusing on federal compliance and government

ethics. Following his time in the White House, Mr. Passantino returned to private practice at the firm Michael Best & Friedrich, LLP, where he led the firm's Political Law group. In total, Mr. Passantino has been a lawyer for over 30 years, with extensive experience handling sensitive ethical, political, and legal issues for high-profile clients.

12.     After clerking for a judge on the U.S. District Court for the District of Maryland—who also served by designation on the U.S. Court of Appeals for the Fourth Circuit—Mr. Passantino worked at several prominent law firms. Chambers USA identified him as one of the leading political lawyers in the country. He is a co-author of the Handbook on Corporate Political Activity and other works relating to political compliance matters. After leaving his position as Deputy White House Counsel and joining the Michael Best law firm, Mr. Passantino helped form the law firm Elections, LLC.

13.     Throughout his professional career, Mr. Passantino has been passionate about the legal profession and its ethics.

14.     Mr. Passantino represented several witnesses before the United States House Select Committee on the January 6th Attack, including Cassidy Hutchinson. Mr. Passantino represented each of his witnesses honorably, ethically, and fully consistent with his legal and ethical obligations. In total, Mr. Passantino represented multiple clients before the Committee, spanning

many hours of testimony, including representing Ms. Hutchinson in three extended interviews amounting to approximately 20 hours.

15. During Mr. Passantino's representation of Ms. Hutchinson, the Committee repeatedly thanked Mr. Passantino for his clarifying questions and for keeping Ms. Hutchinson on track during her interviews. Moreover, a review of Ms. Hutchinson's three transcripts when Mr. Passantino represented her makes it clear Mr. Passantino was not attempting to obstruct her testimony or shape it in any way. In fact, Mr. Passantino made it clear on multiple occasions to Ms. Hutchinson that he did not care what her testimony was as long as it was the truth.[1]

16. Despite having made numerous public references to Mr. Passantino's conduct in defending Cassidy Hutchinson, the Committee only publicly made available the actual transcripts of Mr. Passantino's representation of Ms. Hutchinson on a single day, December 31, before those transcripts were removed. The Committee has never made publicly available the video recordings of Mr. Passantino representing any of his clients before the Committee. In fact, the Committee appears to have "destroyed or got rid

---

[1] These transcripts can be located at: https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000050113/pdf/GPO-J6-TRANSCRIPT-CTRL0000050113.pdf; https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000051189/pdf/GPO-J6-TRANSCRIPT-CTRL0000051189.pdf; and https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000930041/pdf/GPO-J6-TRANSCRIPT-CTRL0000930041.pdf).

of" the videotapes of Ms. Hutchinson's interviews as well as other documentary evidence exonerating Mr. Passantino and supporting the claims set forth in the Complaint.[2]

### *THE COMMITTEE SEEKS CASSIDY HUTCHINSON'S TESTIMONY*

17.   The Select Committee first sought Ms. Hutchinson's testimony through a subpoena issued on or about November 9, 2021, and she was served on or about January 26, 2022, with a return date for documents in mid-February 2022.

18.   According to Ms. Hutchinson's testimony, she reached out to numerous lawyers but was worried about how she could afford to retain counsel. She sought assistance to pay for legal counsel from multiple sources, including from Save America PAC.

19.   Through Ms. Hutchinson's outreach, she was connected with individuals who were responsible, in part, for vetting the use of Save America PAC funds. Specifically, Ms. Hutchinson was connected with Liz Horning, who reached out to representatives for Save America PAC, who then connected Ms. Hutchinson with Mr. Passantino, through his law partners.

---

[2] John Solomon and Steven Richards, *Democrats' star J6 witness Cassidy Hutchinson made significant changes to her story, memo shows*, JUST THE NEWS (Nov. 30, 2023), https://justthenews.com/accountability/political-ethics/democrats-star-j6-witness-made-signficant-changes-testimony.

20.     Mr. Passantino treated Ms. Hutchinson as any other client. He engaged in proper protocols to ensure that there were no conflicts of interest. Mr. Passantino did not perceive Ms. Hutchinson to have an adverse interest to any other of his clients; Ms. Hutchinson was merely a fact witness providing testimony. At the time of Mr. Passantino's first meeting with Ms. Hutchinson, he was aware and operating upon the knowledge that Ms. Hutchinson had contacted Save America PAC in the hopes the PAC would retain counsel on her behalf. Mr. Passantino was further aware and operating upon the knowledge that members of his own firm had engaged in communications with Ms. Hutchinson about Save America PAC's agreement to pay the fees associated with his representation of her.

21.     Mr. Passantino made it clear in his first meeting with Ms. Hutchinson that despite the fee arrangement, he was her lawyer and owed her a duty and that the only people he could talk to about her case were his law firm partners unless he had first received her consent. All of Mr. Passantino's statements to any other third party were authorized by his client, Ms. Hutchinson.

22.     Ms. Hutchinson never told Mr. Passantino that she wanted a "non-Trump" lawyer or that she had any sensitivity about Mr. Passantino's previous work in the Trump White House. She did not express reservations to Mr. Passantino about him being paid by a Trump-related PAC; instead, she had

solicited that funding herself. Ms. Hutchinson advised that she did not want to provide any information that was harmful to President Trump.

23.    Mr. Passantino recommended that Ms. Hutchinson should cooperate with the Committee, notwithstanding her stated reluctance to do so.

24.    Mr. Passantino gave Ms. Hutchinson standard lawyering instructions for a witness at a deposition or recorded interview, including but not limited to instructions about not speculating, speaking only from direct knowledge, not seeking out extraneous information in preparation for the deposition or interview, and not stating that she had recollection of facts she did not recall.

25.    Mr. Passantino informed Ms. Hutchinson that she must limit her testimony to her personal knowledge.

26.    Mr. Passantino repeatedly reminded Ms. Hutchinson that she should not speculate about things that she did not know. Mr. Passantino specifically informed Ms. Hutchinson not to assume parts of conversations of which she could only hear part.

27.    Further, Mr. Passantino encouraged Ms. Hutchinson to comply with the subpoenas and to testify truthfully.

28.    Mr. Passantino instructed Ms. Hutchinson to answer questions truthfully and honestly but not to concoct "probable answers" to questions to

which she could not know or recall the answers, or which called for expert opinion evidence.

29.     Ms. Hutchinson testified that "Stefan never told me to lie. He specifically told me 'I don't want you to perjure yourself.'" She further testified that Mr. Passantino cautioned her that she could not say that she didn't recall events if she did recall them. She reiterated: "he didn't tell me to lie. He told me not to lie."

30.     Therefore, Mr. Passantino did NOT advise her that she could or should state that she does not recall in response to any questions where she does not recall all the details. Rather, Mr. Passantino gave her standard lawyering instructions that she should testify honestly to what she recalls and nothing else.

31.     Mr. Passantino also instructed Ms. Hutchinson not to answer a question immediately when he objected, but rather to think a moment, so as to give her the opportunity to think about the question and objection (such as "calls for speculation", "calls for revelation of attorney-client privileged communications", or "calls for information protected by Executive Privilege").

32.     Further, Mr. Passantino did not improperly leverage his effort to assist with Ms. Hutchinson's search for a job in any way to shape her testimony. At no time was this job search in any way connected with Mr. Passantino's representation of Ms. Hutchinson. In fact, Mr. Passantino has

worked to assist multiple former Trump administration staffers to find work after the administration because of the difficult employment environment faced by those who served in the Trump Administration.

33.    Additionally, regarding the payment of Ms. Hutchinson's legal fees, any assistance in searching for a job was provided separately from any decisions made regarding Ms. Hutchinson's subpoena, testimony, or legal decision-making. It was always made clear to Ms. Hutchinson that Mr. Passantino was her lawyer and Ms. Hutchinson's best interests came first.

### THE COMMITTEE ESTABLISHED A BACKCHANNEL BEHIND MR. PASSANTINO'S BACK WITHOUT DUE PROCESS OR NOTICE

34.    Despite all of this, during Mr. Passantino's representation of Cassidy Hutchinson, the Committee took actions against Mr. Passantino that injured his property and person. Specifically, the Committee interfered with Mr. Passantino's representation of his client and leaked private information to news agencies in order to harm Mr. Passantino and advance a preordained political and legal narrative. These actions invaded Mr. Passantino's privacy by publicizing private information, resulting in significant damage to his personal and business relationships as well as causing him significant emotional trauma. The Committee took these actions without providing any notice or process to Mr. Passantino.

35.     According to Ms. Hutchinson's testimony, following her second voluntary interview, a member of the House of Representatives communicated directly with Ms. Hutchinson, knowingly bypassing her lawyer Mr. Passantino. According to Ms. Hutchinson, the representative told her that because Mr. Passantino was being paid by a Trump-affiliated third-party he would not be advancing her interests and instead would be advancing those of former President Trump and his allies.

36.     Ms. Hutchinson and the representative concealed their communication from Mr. Passantino. This communication unjustifiably undermined Ms. Hutchinson's trust in Mr. Passantino and improperly disrupted their attorney-client relationship.

37.     Thereafter, upon information and belief based upon the sworn testimony of Ms. Hutchinson, Ms. Hutchinson, Congresswoman Liz Cheney, and Counsel Dan George of the Select Committee established a "backchannel" of communication. Either directly or through an intermediary, Ms. Hutchinson provided information to the Committee and arranged for the Committee to summon her for a third interview.

38.     At all times during this backchannel, the Committee was aware that it was communicating with Ms. Hutchinson, a represented party, without going through her counsel of record, and the Committee concealed those communications from Mr. Passantino.

39.    The Committee then, in complete violation of Constitutional limitations upon its authority as a legislative body and without any semblance of due process for Mr. Passantino, attempted to set up a secret law enforcement "sting" operation in Congressional offices seeking to induce Mr. Passantino to obstruct Congress during a third interview of Ms. Hutchinson.

40.    On May 12, 2022, Mr. Passantino accompanied Ms. Hutchinson to a third appearance before Congresswoman Liz Cheney and Senior Investigative Counsel Dan George of the Committee. Counsel for the Committee participated in this appearance even though it was the fruit of an improper, illegal, and unethical surreptitious backchannel communications between Ms. Hutchinson and the Committee (which at all times was represented by counsel and was at least conducted by Congresswoman Liz Cheney, who is a member of the bar herself, as well as others).

41.    Contrary to the hopes of the Committee, including Congresswoman Liz Cheney and Senior Investigative Counsel Dan George, Mr. Passantino did not obstruct or otherwise interfere with the testimony being provided by Ms. Hutchinson.  A videotape recording of this interview, if not subsequently destroyed by the Committee, supports this allegation.

42.    Following the May 12, 2022 interview, Dan George, Senior Investigative Counsel for the Committee, denied responsibility for leaking information about the May 12 interview but also admitted that only he,

Congresswoman Liz Cheney, and a few staff members knew it had occurred at the time. Mr. George advised Mr. Passantino that other members of the Committee had been unaware of the May 12, 2022 interview at the time it took place.

43.     After the third interview, Ms. Hutchinson engaged new counsel. Thereafter, she worked with the Committee to arrange for a public appearance on June 28, 2022, broadcast live by all major national cable news organizations and reported prominently by all major national media outlets.

44.     Following her public appearance, Ms. Hutchinson sat for additional Committee interviews on September 14 and 15, 2022.

45.     Following these interviews, the transcripts of Ms. Hutchinson's September interviews were leaked by the Committee to the news media without Mr. Passantino ever having been interviewed, notified of the allegations made against him, or given an opportunity to respond and defend his reputation.

46.     On December 19, 2022, Pam Brown and Katelyn Polantz, reporters with CNN, called Mr. Passantino and informed him that CNN was going to be publishing a piece about his representation of Ms. Hutchinson. Ms. Brown informed Mr. Passantino that she was in possession of at least one transcript of Ms. Hutchinson's testimony and believed that the Committee would allege

he had counseled Ms. Hutchinson to not answer the Committee's questions fully and honestly.

47.     The only way that Ms. Brown and Ms. Polantz could have obtained the transcript of Ms. Hutchinson's testimony is from a member or a staffer of the Committee. The Committee had not, at that time, officially released the transcripts of Ms. Hutchinson's testimony. Therefore, it is clear that a member of the Committee or a staffer for the Committee or both had leaked this transcript to CNN to ensure maximum damage was done to Mr. Passantino's reputation and his existing and future legal, political, and business clients.

48.     As has been found previously, a member of Congress or their staff or both are acting outside of the scope of their legislative function when they leak non-public investigative information to the media because such action is not tied to the official actions of Congress in any way.

49.     On Monday, December 19, 2022, the Committee released the executive summary of its final report. In this summary, the Committee stated, "[t]he Committee has substantial concerns regarding potential efforts to obstruct its investigation, including by certain counsel (some paid by groups connected to the former President) who may have advised clients to provide false or misleading testimony to the Committee."

50.     The Committee took these actions without providing any notice or opportunity to Mr. Passantino to respond to its allegations against him.

51.    A member of the Committee, a staffer, or both leaked the transcripts to CNN with the intent that CNN determine that Mr. Passantino was the counsel that was mentioned in the summary without specifically identifying Mr. Passantino. CNN took the bait and reached out to Mr. Passantino and eventually published the information.

52.    On or about December 20, 2022, and thereafter, Mr. Passantino became aware that CNN was in possession of contemporaneous text message communications between Ms. Hutchinson and others, which might serve to verify Mr. Passantino's version of events. Notwithstanding CNN's possession of this information, CNN refused Mr. Passantino's repeated requests to include information in its possession in its reporting to ensure CNN's reporting was balanced and accurate. In these text messages, which upon information and belief had been provided directly to CNN from the individual involved, Ms. Hutchinson advised a colleague, "I don't want to comply [with the Committee but] Stefan wants me to comply."  Ms. Polantz notified Mr. Passantino and his counsel that CNN had determined not to include any reference to these contemporaneous text messages between Ms. Hutchinson and others in their possession  in its reporting because the text messages were not "newsworthy."

53.    CNN's determination that the full and accurate truth was not newsworthy is pertinent because it highlights what an egregious invasion of privacy it was for the Committee and its members and staff to strategically

leak the information it leaked. The Committee leaked private information in order to cause a damaging news story. CNN has admitted that the true story exonerating Mr. Passantino's ethical conduct is not newsworthy, or in other words not something in which the public would have an interest.

54.     On December 21, 2022, CNN ran an article titled "Exclusive: Trump's former White House ethics lawyer told Cassidy Hutchinson to give misleading testimony to January 6 committee, sources say." In this article, CNN stated that the Committee had "made a startling allegation on Monday, claiming it had evidence that a Trump-backed attorney urged a key witness to mislead the committee about details they recalled."

55.     In the same article, CNN went on to claim, "Stefan Passantino, the top ethics attorney in the Trump White House, is the lawyer who allegedly advised his then-client, former White House aide Cassidy Hutchinson, to tell the committee that she did not recall details that she did, sources familiar with the committee's work tell CNN." This allegation to CNN was leaked by the Committee, either by a member or members of the Committee, or a staffer or staff of the Committee.

56.     This is evidenced by the fact that after Ms. Hutchinson returned to the Committee for her third confidential interview, it was quickly leaked to the media that this interview occurred.

57.     These interviews were, therefore, wholly private, yet were somehow leaked to the media, nonetheless.

58.     Moreover, the transcripts for interviews were not released until after the Committee released the final report. Therefore, only a member or staffer of the Committee or both would be able to leak the transcript to CNN.

59.     As the transcripts of Ms. Hutchinson's testimony make clear, she confirmed under oath that Mr. Passantino did not advise her to lie to the Committee or to perjure herself. Rather, Mr. Passantino gave her standard advice that she could respond that she did not recall information unless she actually recalled the information requested by a question. As Ms. Hutchinson put it on September 14, 2022, "*Stefan never told me to lie.*" (emphasis added).

60.     At all times, Mr. Passantino advised Ms. Hutchinson to respond to the Select Committee's questions truthfully and fully, even when Ms. Hutchinson expressed reluctance to do so. Ms. Hutchinson herself testified: "Stefan never told me to lie. He specifically told me 'I don't want you to perjure yourself.'" She further testified that Mr. Passantino cautioned her that she could not say that she didn't recall events if she did recall them. She reiterated: "he didn't tell me to lie. He told me not to lie."

61.     The CNN article went on to claim, "Trump's Save America political action committee funded Passantino and his law firm Elections, LLC, including paying for his representation of Hutchinson, other sources tell CNN.

The committee report notes the lawyer did not tell his client who was paying for the legal services."

62.   Ms. Hutchinson admitted, however, in her testimony that she had applied for funding from Mr. Trump's PACs. Ms. Hutchinson testified that she had been in touch with multiple organizations within and without, as she put it, "Trump World," seeking financial assistance in dealing with her subpoena. During this time, she was connected with a representative of Save America PAC, who connected her with Mr. Passantino.

63.   On February 4, 2021, Ms. Hutchinson emailed a senior aide to Former President Trump who was connected with a Pro-Trump Political Action Committee, the Save America Leadership PAC (the "PAC"). In that email she wrote that the return date for her subpoena was just days away and that she had been unable to retain counsel.

64.   She explained that she and her family were struggling financially and requested a referral to potential counsel as well as "financial assistance."

65.   Mr. Passantino had represented several other former aides who had been subpoenaed by the Committee and agreed to take Ms. Hutchinson on as a client. The fees for Ms. Hutchinson and several other former junior aides represented by Mr. Passantino were paid by Save America PAC. Save America PAC also paid for the legal fees of many other former aides who were represented by other law firms unaffiliated with Mr. Passantino and his firms.

19

66.    Moreover, Ms. Hutchinson never expressed any concerns to Mr. Passantino about who was paying her legal costs.

67.    In a statement to CNN before its publication, Mr. Passantino said he didn't advise Ms. Hutchinson to mislead the Committee. "I believed Ms. Hutchinson was being truthful and cooperating with the Committee throughout the several interview sessions in which I represented her."

68.    Despite this statement, which clearly outlines the issues with the leak and the story itself, CNN chose to run the story, likely because it was given to CNN by the Committee, a member of the Committee, or a staffer of the Committee; a source that CNN considered to be beyond reproach.

69.    The Committee's action in leaking these private facts resulted in significant reputational, emotional, and economic damage to Mr. Passantino due to the publication of information in which the public had no interest. The public had no interest in the attorney-client relationship between Mr. Passantino and Ms. Hutchinson.

70.    The Committee deliberately leaked information to news media, immediately before it would have quietly become public, in order to bring attention to private facts and, in doing so, damage Mr. Passantino.

71.    The Committee's damaging actions in leaking this information had their intended effect. Mr. Passantino separated from one of his firms, Michael Best, due to the allegations in the news media. In addition, Mr. Passantino is

now defending himself against bar complaints brought by third parties seeking funding and attention for themselves but having no particular knowledge of the facts and apparently no regard for fundamental legal notions of due process or presumption of innocence.

72.    This is all a result of the Committee's unjustifiable, outrageous, and malicious leaks of private information and interference in Mr. Passantino's representation of his clients.

73.    It is especially egregious that the Committee leaked this information considering that in an errata sheet dated September 22, 2022, containing Ms. Hutchinson's online signature, Ms. Hutchinson made 15 pages worth of material changes to her prior testimony to the Committee.[3] These extensive "corrections" indicate that she was not being truthful with her counsel or the Committee at first, but is now seeking to officially change her statements to reflect the more sensational story that she later told.

74.    As a consequence of the false actions taken against Mr. Passantino by the Committee, and those working in concert with the Committee for political ends, Mr. Passantino has suffered severe financial and reputational harm, has been exposed to numerous physical threats to himself and his family, harassment, has received numerous, well-publicized bar complaints

---

[3] *See supra* note 2.

filed by groups which Mr. Passantino never interacted with or had an opportunity to rebut, and has suffered significant emotional harm.

75.    Mr. Passantino, therefore, seeks restitution from the United States for the damage done to him by the Committee and its members and staff pursuant to the Federal Tort Claims Act. Mr. Passantino is entitled to be fully compensated for each and every one of his pecuniary and non-pecuniary losses resulting from the Committee's conduct against him.

## CAUSES OF ACTION

### COUNT I
### Federal Tort Claims Act
### Invasion of Privacy

76.    Plaintiff incorporates by reference the above paragraphs as though set forth fully herein.

77.    The Federal Tort Claims Act provides "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

78.    Plaintiff has exhausted his administrative remedies under 28 U.S.C. § 2675 of the Federal Tort Claims Act as a prerequisite to instituting a claim against the United States for money damages for injury or loss of property or personal injury caused by the negligent or wrongful act or omission

of any employee of the United States government while acting within the scope of his or her office or employment.

79.   By letter delivered April 14, 2022, Plaintiff presented his administrative claim to the United States House of Representatives.

80.   The House of Representatives has not responded within the prescribed statutory deadline to Mr. Passantino's Form 95 submission and, therefore, Mr. Passantino's Form 95 is, as of the filing of this Complaint, deemed denied, exhausting Mr. Passantino's administrative remedies and granting him the right to sue in this Court.

81.   Defendant is responsible for the actions of those named herein as Members of the Committee or their staff.

82.   The House of Representatives invaded Mr. Passantino's privacy by intentionally leaking and making public private facts that would not otherwise have become public concerning Mr. Passantino's representation of Ms. Hutchinson.

83.   Indeed, the House or its agents, all of whom are agents of Defendant, intentionally leaked private information, including private information that otherwise would have remained private, in order to cause the news media to publish a false story about these private facts that would damage Mr. Passantino. This suit is not based on the defamatory sting of the

ensuing publication; rather it is based on the publication of private information.

84.    This conduct deprived Mr. Passantino of his Due Process rights under the United States Constitution. Notably, Defendant released this private information without notice to Mr. Passantino, and without affording him the opportunity to confront his accusers or otherwise defend himself before imposing a "sentence" of the destruction of his professional career.

85.    The facts disclosed would be offensive to any reasonable person. Indeed, they impugn Mr. Passantino's character and ethics, traits that are essential to his work and all relationships, both personal and professional.

86.    Given that the House and its agents acted outside its scope by leaking non-public information, there was no privilege in the communication of these private facts or other actions of the House or its agents.

## COUNT II
**Civil Conspiracy**

87.    Plaintiff incorporates by reference the above paragraphs as though set forth fully herein.

88.    Defendant and its agents engaged in the foregoing actions in agreement with unnamed co-conspirators, including individuals that worked at media companies, to accomplish their goal of invading Mr. Passantino's privacy and attorney-client relationship to cause harm to his practice of law

and standing in the community. They did so without affording Mr. Passantino any Due Process.

89.     This agreement is exemplified by the dissemination of private information that otherwise would not have become public or would have quietly become public in an attempt to create a damaging new story about Mr. Passantino based on private information.

90.     Mr. Passantino was harmed as a result of this conspiracy.

## JURY DEMAND

91.     Plaintiff demands a trial by jury on all issues triable by jury.

## PRAYER FOR RELIEF

92.     Plaintiff respectfully requests this Court to enter a judgment in his favor and grant relief against the Defendants as follows:

a.  Compensatory damages in an amount to be determined at trial;

b.  Reasonable attorneys' fees with respect to all of Plaintiff's causes of action; and

c.  Any other relief the Court deems proper.

Dated: December 20, 2023

STEFAN PASSANTINO
By Counsel


Respectfully submitted,

*/s/Bryan P. Tyson*
Bryan P. Tyson (Ga. Bar No. 515411)
THE ELECTION LAW GROUP
1600 Parkwood Circle
Suite 200
Atlanta, GA 30339
Phone: 678-336-7249
Email: btyson@theelectionlawyers.com


Jesse R. Binnall (*pro hac vice* forthcoming)
Shawn M. Flynn (*pro hac vice* forthcoming)
Jared J. Roberts (*pro hac vice* forthcoming)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
Email: jesse@binnall.com
        shawn@binnall.com
        jared@binnall.com

*Attorneys for Plaintiff*