**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
ROME DIVISION**

| | | |
|---|---|---|
| STEFAN PASSANTINO, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | 4:23-CV-00300-ELR |
| | * | |
| UNITED STATES OF AMERICA, | * | |
| | * | |
| Defendant. | * | |
| | * | |

—————

**O R D E R**

—————

There are several motions currently pending before the Court. The Court sets

forth its reasoning and conclusions for each below.

**I.    Background[1]**

This case concerns Plaintiff Stefan Passantino's claims for invasion of privacy

and civil conspiracy against members of the U.S. House Select Committee to

Investigate the January 6th Attack on the United States Capitol (the "Committee").

See generally Compl. [Doc. 1]. Passantino, a practicing Washington D.C. attorney

and former White House ethics lawyer during the first Trump Administration,

---

[1] In determining whether the United States is entitled to judgment on the pleadings, the Court accepts as true all material facts alleged in Passantino's pleading and construes all reasonable inferences in his favor. Perez v. Wells Fargo N.A., 774 F.3d 1329, 1335 (11th Cir. 2014).

represented several clients who testified before the Committee, including Cassidy Hutchinson, a former Trump White House aide. Id. ¶¶ 3, 7, 14, 55. Passantino met Hutchinson and other Committee witnesses through the Save America Leadership PAC, a political action committee which covered Hutchinson's legal fees. Id. ¶¶ 18–20, 22, 63–65. To prepare Hutchinson for her testimony, Passantino gave her "standard lawyering instructions," including to comply with the subpoena, to testify truthfully, and to avoid speculation. Id. ¶¶ 24–28, 30.

In May 2022, Passantino accompanied Hutchinson to a Committee interview with Congresswoman Liz Cheney and Senior Investigative Counsel Dan George. Id. ¶ 40. Before that interview, Cheney and George contacted Hutchinson without Passantino's knowledge and advised her that Passantino "would not be advancing her interests" because he "was being paid by a Trump-affiliated third-party." Id. ¶ 35. According to Passantino, these statements undermined Hutchinson's trust in him and improperly disrupted their attorney-client relationship, which ultimately led her to seek new legal representation. Id. ¶¶ 36, 43.

Hutchinson participated in additional interviews with the Committee in September 2022. Id. ¶ 44. Though the transcripts of those interviews were not publicly available until after the Committee released its final report, a Committee member or staffer allegedly leaked the transcripts to CNN before they became public "to ensure maximum damage was done to Mr. Passantino's reputation and his

existing and future legal, political, and business clients." <u>Id.</u> ¶¶ 45, 47–48, 58. Passantino learned of this purported leak on December 19, 2022, when CNN reporters called to inform him that they intended to publish a piece about his representation of Hutchinson. <u>Id.</u> ¶ 46. During the call, one of the reporters advised Passantino that she obtained a transcript of Hutchinson's September 2022 interview and suggested that the Committee would allege he had counseled Hutchinson not to answer the Committee's questions fully and honestly. <u>Id.</u>

Later that day, the Committee released an executive summary of its final report, which stated, "[t]he Committee has substantial concerns regarding potential efforts to obstruct its investigation, including by certain counsel (some paid by groups connected to the former President) who may have advised clients to provide false or misleading testimony to the Committee." <u>Id.</u> ¶ 49. Soon after, CNN published an article entitled "Exclusive: Trump's former White House ethics lawyer told Cassidy Hutchinson to give misleading testimony to January 6 committee, sources say." <u>Id.</u> ¶ 54.

According to Passantino, the transcripts contradict CNN's story and instead show that Hutchinson repeatedly testified that Passantino told her not to lie to the Committee or perjure herself. <u>Id.</u> ¶¶ 59–60. Yet, CNN chose to run the story anyway, "likely because it was given to CNN by the Committee, members of the Committee, or a staffer of the Committee[.]" <u>Id.</u> ¶ 68. Passantino alleges that the Committee's

"false actions" in leaking the story "for political ends" resulted in physical threats to him and his family, harassment, and bar complaints, all of which caused severe personal and professional harm. Id. ¶ 74.

In December 2023, Passantino filed this suit under the Federal Tort Claims Act ("FTCA") alleging invasion of privacy (Count I) and civil conspiracy (Count II). See id. ¶¶ 76–90. The United States missed the deadline to respond to the Complaint and instead requested more time, which the Court denied for failure to show good cause. [Docs. 18; 19]. Thereafter, the United States requested another extension, this time with a more complete explanation for its delay, and filed a late Answer a few days later.[2] [Docs. 21; 24]. Before the United States filed its Answer, Passantino moved for an entry of default, which the clerk entered. [Doc. 22]. The United States now moves to set aside the entry of default and, through its motion for judgment on the pleadings, asks the Court to dismiss this case. [Docs. 25; 27]. Additionally, Passantino moves for default judgment and asks the Court to take judicial notice of two U.S. House reports related to this case. [Docs. 35; 39; 42]. All pending motions have been fully briefed and are ripe for this Court's review.[3] The

---

[2] Because the United States filed its Answer before the Court granted the request for extension, the Court construes the United States's Motion for Extension of Time to File Answer [Doc. 21] as a request to accept its out-of-time Answer.

[3] The day its response brief to Passantino's second motion for judicial notice was due, the United States filed an unopposed request for extension. [Doc. 43]. The Court grants that motion and accepts the United States's response as timely. [Doc. 44].

Court will begin with the motions for judicial notice, then take up the motions related to default judgment, and lastly address the motion for judgment on the pleadings.

## II.    Motions for Judicial Notice

Passantino asks the Court to take judicial notice of certain facts from two interim reports released by the U.S. House Committee on House Administration. [See Docs. 39-1; 42-1]. The first is an October 15, 2024 press release concerning text messages between then-Representative Liz Cheney and other individuals involved in this case (the "October Report").[4] [See Doc. 39-1]. The second is a December 17, 2024 report entitled "The Failures and Politization of the January 6th Select Committee" (the "December Report"), which reviews and critiques various actions taken by Cheney and other Committee members.[5] [See Doc. 42-1]. Passantino contends that the Reports support his invasion of privacy and conspiracy claims by showing that Cheney and others communicated with Hutchinson to discuss her attorney-client relationship with Passantino and used non-public information related to that relationship to damage him. [Docs. 39-1 at 5–6; 42-1 at 5–8]. The United States challenges the relevance of both Reports and argues that the

---

[4] See U.S. House of Representatives Comm. on House Admin., New Texts Reveal Liz Cheney Communicated with Cassidy Hutchinson (Oct. 15, 2024), https://cha.house.gov/press-releases?ID=46BC1893-41CA-4E6B-834C-2B2B2A6BDB70.

[5] See U.S. House of Representatives Comm. on House Admin., Interim Report on the Failures and Politization of the January 6th Select Committee (Dec. 17, 2024), https://cha.house.gov/_cache/files/6/d/6dae7b82-7683-4f56-a177-ba98695e600d/145DD5A70E967DEEC1F511764D3E6FA1.final-interim-report.pdf.

Court should not consider the Reports for the truth of their contents. [See Docs. 40; 44].

Under Rule 201 of the Federal Rules of Evidence, a court *must* take judicial notice of facts "not subject to reasonable dispute" (i.e., facts that "can be accurately and readily determine from sources whose accuracy cannot be reasonably questioned") "if a party requests it and the court is supplied with the necessary information." Fed. R. Evid. 201(b), (c). Courts commonly judicially notice facts contained in public documents because they are "sources whose accuracy cannot reasonably be questioned." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999); see also Universal Express, Inc. v. U.S. S.E.C., 177 F. App'x 52, 53 (2006) ("Public records are among the permissible facts that a district court may consider."); Henderson v. Sun Pharm. Indus., Ltd., 809 F. Supp. 2d 1373, 1379 n.4 (N.D. Ga. 2011) ("The Court is permitted to take judicial notice of documents made publicly available by a government entity."). Rule 201 also allows a court to judicially notice a fact "at any stage of the proceeding." Fed. R. Evid. 201(d).

Here, Passantino has provided both Reports, the authenticity of which the United States does not question. The Court likewise finds no reason to question the authenticity of the Reports, which are publicly available on an official government website. See Omnibus Trading, Inc. v. Gold Creek Foods, LLC, 591 F. Supp. 3d 1334, 1345 (N.D. Ga. 2021) (taking judicial notice of guidance documents published

on a federal agency's website). Moreover, Passantino specifically identifies which parts of the Reports are relevant to his claims and how they are relevant. Cf. Tolston v. City of Atlanta, 723 F. Supp. 3d 1263, 1323 (N.D. Ga. 2024) (declining to take judicial notice of facts unrelated to the proceeding). For example, Passantino explains that the text messages exchanged between Liz Cheney and others contained in the October Report demonstrate how members of the Committee accessed and leaked his private information. [Doc. 39-1 at 5–6].

Similarly, Passantino points to pages 19–25, 46–48, and 117 of the December Report to show that Liz Cheney communicated behind Passantino's back about his representation of Hutchinson, that Committee members considered the leaked information to be "not-yet-public," and that the U.S. House Committee on House Administration recommended a criminal investigation against Cheney because of her conduct involving Passantino. [Doc. 42-1 at 5–8]. These facts are relevant to Passantino's claims for invasion of privacy and conspiracy because they relate to the allegations contained directly in the Complaint—namely, that members of the Committee secretly communicated about and conspired to leak Passantino's private information.

Lastly, the United States correctly notes that the Reports serve a limited purpose—while the Court can judicially notice the existence of the Reports and the statements contained therein, it cannot use the Reports to establish the truth of those

statements. See Bryant, 187 F.3d at 1277–78 (judicially noticing SEC filings "for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents"); cf. Sprengle v. Smith Maritime Inc., 660 F. Supp. 3d 1337, 1351–52 (M.D. Fla. 2023) (declining to judicially notice medical records used to establish that the plaintiff was at a certain place at a certain time). Thus, the Court takes judicial notice of the Reports only to the extent that they demonstrate the existence of certain statements, such as the text messages exchanged by Cheney, Hutchinson, and others involved in this case; the Court declines to use the Reports to assess the veracity of those statements. Accordingly, the Court grants Passantino's motions for judicial notice.

### III.    Motion to Set Aside Entry of Default and Related Motions

Passantino moved for default, which the Clerk properly entered, on grounds that the United States failed to timely respond to the Complaint. [Doc. 22 at 2]; see Fed. R. Civ. P. 55(a). The United States then filed a late Answer and now asks the Court to set aside the entry of default. [Docs. 24; 25-1]. Because the United States has shown good cause, the Court grants the United States's motion, accepts the late Answer, and sets aside the default.

### A.    Legal Standard

Generally, a party must answer a complaint within 21 days of being served. Dyer v. Wal-Mart Stores, Inc., 535 F. App'x 839, 843 (11th Cir. 2013) (citing Fed.

R. Civ. P. 12(a)(1)(A)(i)). If a defendant fails to file a timely answer, "upon motion by the plaintiff, the clerk must enter default against the defendant pursuant to Fed. R. Civ. P. 55(a)." Insituform Techs., Inc. v. AMerik Supplies, Inc., 588 F. Supp. 2d 1349, 1352 (N.D. Ga. 2008). But the Court may, in its discretion, set aside an entry of default for "good cause" under Rule 55(c).[6] Id.; see also Perez v. Wells Fargo N.A., 774 F.3d 1329, 1338 (11th Cir. 2014).

"Good cause is a mutable standard, varying from situation to situation. It is also a liberal one—but not so elastic as to be devoid of substance." Compania Interamericana Export-Import, S.A. v. Compania Dominicana de Aviacion, 88 F.3d 948, 951 (11th Cir. 1996) (cleaned up). While good cause "is not susceptible to a precise formula, . . . some general guidelines are commonly applied." Id. For example, courts consider "whether the default was culpable or willful, whether

---

[6] Ordinarily, courts evaluate whether to accept an out-of-time filing under the "more rigorous" "excusable neglect" standard of Rule 6(b)(1)(B). See E.E.O.C. v. Mike Smith Pontiac GMC, Inc., 896 F.2d 524, 528 (11th Cir. 1990) (noting that the "excusable neglect" standard is "more rigorous" than the "good cause" standard). But because the entry of default here is premised on the United States's failure to timely answer, the Court will evaluate both the motion to set aside default and construed motion to accept the out-of-time Answer together, under a good cause standard. See Perez, 774 F.3d at 1338 (evaluating motion to file an out-of-time answer under Rule 55(c) "good cause" standard instead of Rule 6(b)(1)(B) "excusable neglect" standard where opposing party sought an entry of default); A. Garcia Trucking & Produce, LLC v. Mi Pueblo Supermarket, LLC, No. 1:18-CV-01127-ELR, 2019 WL 12285204, at *1–2 (N.D. Ga. June 17, 2019) (applying Rule 55(c) "good cause" standard to motion for entry of default premised on defendant's failure to timely answer); Lewis v. Home Depot, No. 1:14-CV-03871-AT-CMS, 2015 WL 11978530, at *2–3 (N.D. Ga. Sept. 30, 2015) (applying Rule 55(c) "good cause" standard to motion to set aside default and motion to file an out-of-time answer), R&R adopted, 2015 WL 12086092 (N.D. Ga. Oct. 26, 2015).

setting it aside would prejudice the non-moving party, and whether the defaulting party may have a meritorious defense." <u>Id.</u> Courts may look to other factors too, such as "whether the public interest was implicated, whether there was significant financial loss to the defaulting party, and whether the defaulting party acted promptly to correct the default." <u>Id.</u> "Whatever factors are employed, the imperative is that they be regarded simply as a means of identifying circumstances which warrant the finding of 'good cause' to set aside a default." <u>Id.</u>

"The defendant bears the burden of establishing good cause to set aside an entry of default." <u>Insituform Techs.</u>, 588 F. Supp. 2d at 1352. That said, the Eleventh Circuit has repeatedly held that there is strong public policy in favor of resolving cases on the merits and that defaults are disfavored. <u>See, e.g.,</u> <u>Surtain v. Hamlin Terrance Found.</u>, 789 F.3d 1239, 1244–45 (11th Cir. 2015); <u>In re Worldwide Web Sys., Inc.</u>, 328 F.3d 1291, 1295 (11th Cir. 2003); <u>Mitchell v. Brown & Williamson Tobacco Corp.</u>, 294 F.3d 1309, 1316–17 (11th Cir. 2002). "For that reason, any doubts regarding whether to set aside an entry of default should be resolved in favor of the party seeking relief." <u>Insituform Techs.</u>, 588 F. Supp. 2d at 1352.

### B.    Discussion

The United States has shown good cause for accepting its late Answer and setting aside the entry of default for four reasons. First, nothing suggests that the United States acted willfully or culpably in failing to timely respond to the

Complaint. Instead, it promptly acted to cure its mistake by requesting an extension to file its Answer, renewing its request before default was entered, and filing its Answer and motion to set aside just three days after default was entered. [See Docs. 18; 21; 24]; Joe Hand Promotions, Inc. v. Allen, No. CV 118-127, 2018 WL 5087233, at *1 (S.D. Ga. Oct. 18, 2018) ("[C]ourts are hesitant to deem a default willful when a litigant takes prompt action to cure."); Gray v. Mayberry, No. 3:18-CV-045, 2020 WL 1061359, at *2 (S.D. Ga. Feb. 3, 2020) ("[Defendant's] prompt response to entry of default is strong evidence of a cooperative spirit, with no malice or recklessness."); cf. Annon Consulting, Inc. v. BioNitrogen Holdings Corp., 650 F. App'x 729, 732 (11th Cir. 2016) (finding default willful where defendant knew of "the clerk's initial entry of default and still failed to file a responsive pleading" and waited over two months after default was entered to file a motion to set aside).

Second, setting aside the entry of default does not unduly prejudice Passantino. The United States's failure to timely answer delayed the proceedings by only two weeks. This delay has resulted in no loss to Passantino, financial or otherwise. Plus, because the proceedings are stayed and discovery has not yet begun, the delay has not deprived Passantino a competitive advantage in building his case. See Patel v. Baileys BP Shoppes, LLC, No. 1:19-cv-01409, 2020 WL 10459813, at *2 (N.D. Ga. Oct. 26, 2020) (finding no prejudice where opening default would not "increase difficulty litigating this case"); Aughnay v. Starr, No. 1:19-CV-2607-CC,

11

2019 WL 7343480, at *3 (N.D. Ga. Dec. 31, 2019) (explaining that prejudice based on delay requires "a showing that the delay will result in the loss of evidence, create increased discovery difficulties, or provide greater opportunities for fraud and collusion" (citation omitted)).

Third, the United States presents meritorious defenses. For purposes of setting aside an entry of default, those defenses "need only show a 'hint of a suggestion' to meet the requisite standard of a meritorious defense." Buonocore v. Credit One Bank, N.A., No. 3:14-CV-067 (CAR), 2014 WL 6620623, at *2 (M.D. Ga. Nov. 21, 2024) (quoting Moldwood Corp. v. Stutts, 410 F.2d 351, 352 (5th Cir. 1969)). Here, the United States's defenses exceed that standard—as explained below, they resolve this case entirely. Passantino cannot escape dismissal of his claims just because the United States filed its responsive pleading a couple weeks late. See id. (explaining that entry of default is not "a tactical device to be used to avoid litigation of a claim on the merits").

Lastly, the Court finds that setting aside default advances the public interest and aligns with the strong policy preference of determining cases on their merits. See Surtain, 789 F.3d at 1244–45. While the Court agrees with Passantino that rules are important and that no party, even the United States, is above them, refusing to set aside the entry of default is not the proper solution. "The purpose of the entry of default is to give notice to a party that unless they engage in the litigation process,

they could lose their right to do so." <u>Buonocore</u>, 2014 WL 6620623, *2. Here, the entry of default achieved that goal by prompting the United States to file its Answer. Thus, the Court accepts the United States's out-of-time Answer and sets aside the entry of default.[7]

## IV.    Motion for Judgment on the Pleadings

In his Complaint, Passantino asserts claims under the FTCA for invasion of privacy (Count I) and civil conspiracy (Count II). <u>See</u> Compl. ¶¶ 76–90. The United States argues that these claims are barred by the FTCA's intentional tort exception and fail to state a claim upon which relief can be granted. For the reasons below, the Court agrees with the United States and dismisses this case.

### A.    Legal Standard

"A motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Rule 12(b)(6)." <u>Samara v. Taylor</u>, 38 F.4th 141, 149 (11th Cir. 2022). Thus, in evaluating a motion for judgment on the pleadings, a court analyzes whether the complaint "contain[s] sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)); <u>see also</u> <u>Horsley v. Feldt</u>, 304 F.3d 1125, 1131 n.2 (11th Cir. 2002). Put differently,

---

[7] As a result, the Court denies as moot Passantino's motion for default. [Doc. 35]; <u>see</u> <u>Patel</u>, 2020 WL 10459813, at *3 ("In the light of that ruling [to set aside the entry of default], the Court denies Plaintiff's motion for default judgment as moot.").

when deciding a motion for judgment on the pleadings, a court looks to see whether the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. "Judgment on the pleadings is appropriate when there are no material facts in dispute, and judgment may be rendered by considering the substance of the pleadings and any judicially noticed facts." Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998) (citing Fed. R. Civ. P. 12(c)). "In determining whether a party is entitled to judgment on the pleadings," a court "accept[s] as true all material facts alleged in the non-moving party's pleading[s] and . . . view[s] those facts in the light most favorable to the non-moving party." Perez, 774 F.3d at 1335.

### B.    Discussion

#### 1.    Sovereign Immunity and the FTCA

"Sovereign immunity generally protects the United States and its agencies against suit." Smith v. United States, 14 F.4th 1228, 1230–31 (11th Cir. 2021). This principle is "axiomatic" and has long been recognized as a universal feature of the American legal system. United States v. Mitchell, 463 U.S. 206, 212 (1983); see also Cohens v. Virginia, 19 U.S. 264, 411–12 (1821) ("The universally received opinion is, that no suit can be commenced or prosecuted against the United States."). But "[s]overeign immunity does not bar all claims against the United States—only those

filed *without its consent*." <u>Smith</u>, 14 F.4th at 1231. Put simply, someone cannot sue the federal government without the federal government's permission.

That permission must be "unequivocally expressed in statutory text." <u>Fed. Aviation Admin. v. Cooper</u>, 566 U.S. 284, 290 (2012). And any waiver of sovereign immunity "must be strictly construed in favor of the United States and not enlarged beyond what the language of the statute requires." <u>United States v. Idaho ex rel. Dir., Idaho Dep't of Water Res.</u>, 508 U.S. 1, 7 (1993) (cleaned up). Similarly, "courts are required to strictly observe all terms and conditions that accompany a waiver of sovereign immunity." <u>Smith</u>, 14 F.4th at 1231 (quotations omitted). "If there is no specific waiver of sovereign immunity as to a particular claim filed against the Government, the court lacks subject matter jurisdiction over the suit." <u>Zelaya v. United States</u>, 781 F.3d 1315, 1321 (11th Cir. 2015).

By enacting the FTCA, Congress "waived the sovereign immunity of the United States for certain torts committed by federal employees acting within the scope of their employment." <u>Brownback v. King</u>, 592 U.S. 209, 212 (2021) (quotations omitted). "The Act gives federal district courts exclusive jurisdiction over claims against the United States for 'injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission' of a federal employee 'acting within the scope of his office or employment.'" <u>Millbrook v. United States</u>, 569 U.S. 50, 52 (2013) (quoting 28 U.S.C. § 1346(b)(1)). But the Act

also includes a few important limiting conditions "which serve to block the waiver of sovereign immunity that would otherwise occur under the FTCA." Zelaya, 781 F.3d at 1322. Two such limiting conditions are decisive in this case. First, the FTCA's waiver exception in 28 U.S.C. § 2680(h) bars Passantino's claims because they arise out of torts for which Congress has not waived the United States's sovereign immunity. Second, to state a valid FTCA claim, Passantino must plausibly allege all the elements of invasion of privacy and civil conspiracy; he has not.

2.     Section 2680(h) Exception

The FTCA's "broad waiver of sovereign immunity is subject to a number of exceptions set forth in § 2680." Millbrook, 569 U.S. at 52. One such exception, known as the "intentional torts exception," preserves the government's immunity from suit for "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights[.]" Id. (quoting § 2680(h)). The Supreme Court has made clear that "the express words of the statute" bar not only the intentional torts listed in § 2680(h) but also "any claim arising out of" that list. United States v. Shearer, 473 U.S. 52, 55 (1985). "The phrase 'arising out of' is interpreted broadly to include all injuries that are dependent upon one of the listed torts having been committed." Zelaya, 781 F.3d at 1333 (citing Shearer, 473 U.S. at 55); accord Block v. Neal, 460 U.S. 289, 297 (1983) ("[T]he statutory exception

undoubtedly preserves sovereign immunity with respect to a broad range of government actions.").

Put differently, "a cause of action which is distinct from one of those excepted under § 2680(h) will nevertheless be deemed to 'arise out of' an excepted cause of action when the underlying governmental conduct which constitutes an excepted cause of action is 'essential' to plaintiff's claim." Metz v. United States, 788 F.2d 1528, 1534 (11th Cir. 1986) (quoting Block, 460 U.S. at 297), cert. denied, 479 U.S. 930 (1986). While § 2680(h) bars "claims arising out of a certain type of factual situation," Shearer, 473 U.S. at 55, a plaintiff is free to pursue "a distinct claim arising out of other aspects of the Government's conduct." Block, 460 U.S. at 297. The court's "task is to identify those circumstances which are within the words and reason of the exception—no less and no more." Metz, 788 F.2d at 1534 (quotation marks omitted) (quoting Kosak v. United States, 465 U.S. 848, 853 n.9 (1984)).

Here, the United States argues that § 2680(h) bars Passantino's claims because they arise out of libel and slander. [See Doc. 27 at 5–14]. According to the United States, the Complaint alleges that the Committee leaked false statements about Passantino to the media and that without those false statements, the Complaint does not support a viable claim for invasion of privacy or civil conspiracy. [Id. at 10–11]. Passantino contends that the libel/slander exception of § 2680(h) does not bar his claims because, regardless of the truth or falsity of the leaked information,

the harm arises from the Committee's disclosure of private facts, not from any false or defamatory remarks it made about Passantino.[8] [Doc. 32 at 7–12].

The Eleventh Circuit has read the § 2680(h) libel/slander exception to bar invasion of privacy claims arising out of defamation. The most analogous case is <u>Cadman v. United States</u>, 541 F. App'x 911 (11th Cir. 2013). The plaintiff in <u>Cadman</u>, a federal contractor working for a private firm, was tasked with implementing and overseeing a government program. <u>Id.</u> at 912. After the program stirred some controversy, federal agents published statements to the media blaming the plaintiff for the program's problems. <u>Id.</u> When a news story broke and the plaintiff was terminated from his firm, he brought D.C. law claims for invasion of privacy and negligence under the FTCA. <u>Id.</u> The Eleventh Circuit upheld the district court's dismissal for lack of subject matter jurisdiction, determining that his claims were barred by "the libel-slander-misrepresentation exemption" of § 2680(h). <u>Id.</u> at 914. The plaintiff's claims were entirely "based on statements, representations, and imputations" by the government—the type of conduct the FTCA expressly immunizes. <u>Id.</u> (quotation marks omitted). And because the plaintiff could not point

---

[8] Passantino also argues that the United States's motion should be denied as procedurally improper because the late Answer constitutes a non-operative pleading, rendering a motion for judgment on the pleadings premature. [Doc. 32 at 4–7]. Because the Court accepts the United States's late Answer, the pleadings closed before the United States filed this motion, which is now ripe.

to any "other independent government action" to establish his claims, the court lacked subject matter jurisdiction to consider them. Id.

This case is on all fours with Cadman. At bottom, "all of the [Committee's] allegedly tortious actions here are based on statements, representations, or imputations"—actions that would form the basis of a claim barred by the libel/slander exception of § 2680(h). Id. (quotation marks omitted). And Passantino cannot point to any action by the Committee independent of these "statements, representations, or imputations" upon which to base his claims. Passantino insists that this "suit is not based on the defamatory sting of the ensuing publication" but rather "the publication of private information." Compl. ¶ 83. But this assertion contradicts the whole of Passantino's claims, which necessarily depend on the falsity of the information the Committee leaked to the media. Without that false information, Passantino cannot attribute any of the harm alleged in the Complaint to an act by the Committee.

Passantino calls his claims "invasion of privacy" and "civil conspiracy," but in substance, he asserts a claim for defamation. And it is "the substance of the claim and not the language used in stating it which controls." Zelaya, 781 F.3d at 1334 (cleaned up); see also Shearer, 473 U.S. at 55 (emphasizing that "[n]o semantical recasting of events" could save the plaintiff's claim from § 2680(h) exemption). The Complaint repeatedly alleges that the Committee created and disseminated false

information to the media that harmed Passantino's reputation. That is an allegation of defamation, as it is traditionally and commonly understood.[9]

A defamation claim requires: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) . . . the existence of special harm caused by the publication." Restatement (Second) of Torts § 558 (Am. L. Inst. 1977); see also Defamation, Black's Law Dictionary (12th ed. 2024) (defining "defamation" as "[a] false written or oral statement that damages another's reputation"). A "statement" is simply a "communication" that tends "to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559. And "[p]ublication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." Id. § 577

---

[9] When evaluating whether a claim falls within a § 2680(h) exception, courts within the Eleventh Circuit do not look to the law of a particular state, but rather the "traditional and commonly understood definition" of the tort excepted by that section. Metz, 788 F.2d at 1535 n.8 (quoting United States v. Neustadt, 366 U.S. 696, 706 (1961)). Other courts have relied on restatements and other persuasive authority to define exempted claims. See, e.g., O'Ferrell v. United States, 968 F. Supp. 1519, 1528–29 (M.D. Ala. 1997) (relying on the Restatement (Second) of Torts to define "defamation"), aff'd, 253 F.3d 1257 (11th Cir. 2001); Jimenez-Nieves v. United States, 682 F.2d 1, 6 (1st Cir. 1982) (same).

Passantino's entire Complaint "resound[s] in the heartland of the tort of defamation[.]" <u>Jimenez-Nieves v. United States</u>, 682 F.2d 1, 6 (1st Cir. 1982). The Complaint alleges that the Committee:

(a) created a false story that Passantino advised Hutchinson to lie to the Committee, Compl. ¶ 2 ("generated a harmful narrative"), ¶ 5 ("create[d] a narrative"), ¶ 6 ("gave an outrageous narrative"), ¶ 34 ("advance[d] a preordained political and legal narrative"), ¶ 49 (released an executive summary raising "substantial concerns" that "certain counsel" (purportedly Passantino) "may have advised clients to provide false or misleading testimony to the Committee");

(b) published that false story by leaking it to CNN, <u>id.</u> ¶ 2 ("published private information and promoted that narrative"), ¶ 5 ("leaked information . . . to create a narrative that would injure Mr. Passantino"), ¶ 6 ("gave an outrageous narrative to media sources"), ¶ 34 ("leaked private information to news agencies"), ¶ 55 ("[t]his allegation to CNN was leaked by the Committee"), ¶ 68 ("the story . . . was given to CNN by the Committee");

(c) leaked the story with the intent to injure Passantino, <u>id.</u> ¶ 3 ("The Committee . . . had a deliberate goal to ruin Mr. Passantino[.]"), ¶ 5 ("leaked information . . . to create a narrative that would injure Mr. Passantino"), ¶ 34 ("leaked private information to news agencies in order to harm Mr. Passantino"), ¶ 47 ("the Committee . . . leaked this transcript to CNN to ensure maximum damage was done"), ¶ 53 ("leaked private information in order to cause a damaging news story"), ¶ 70 ("The Committee deliberately leaked information to news media[.]"); and

(d) caused Passantino significant personal and professional harm through the leak, <u>id.</u> ¶ 5 ("resulted in serious personal damage to Mr. Passantino"), ¶ 6 ("caused him significant economic, reputational, and emotional harm"), ¶ 34 ("resulting in significant damage to his personal and business relationships as well as causing him significant emotional trauma"), ¶ 69 ("resulted in significant reputational, emotional, and economic damage to Mr. Passantino"), ¶ 74 ("Mr. Passantino has suffered severe financial and reputational harm, has been exposed to numerous physical threats to himself and his family, harassment, has received numerous, well-publicized bar complaints filed by groups which Mr. Passantino never

21

interacted with or had an opportunity to rebut, and has suffered significant emotional harm."), ¶ 84 ("destruction of his professional career"), ¶ 85 ("they impugn Mr. Passantino's character and ethics, traits that are essential to his work and all relationships, both personal and professional").

Passantino attempts to sidestep § 2680(h)'s libel/slander exception by arguing that the harm alleged in the Complaint derives not from the Committee's false statements about him, but from the Committee releasing his "private information." [Doc. 32 at 7–9]. That private information, according to Passantino, consists of privileged "internal discussions" with Hutchinson that the Committee purportedly leaked to the media. [Id. at 8]. The problem with Passantino's argument is that if the Committee's defamatory statements are set aside, the Complaint fails to establish a connection between the "internal discussions" about Passantino's "private information" and the harm alleged in the Complaint. And without that connection, there is no valid FTCA claim.

The Supreme Court clarified this point in Block v. Neal, 460 U.S. 289 (1983), which both Parties cite in support of their respective positions. In Block, a government agency oversaw the construction of the plaintiff's home, but that construction turned out to be defective. Id. at 297. After conducting three inspections, the agency misrepresented that the construction met appropriate standards when it had not. Id. at 292. When the plaintiff eventually realized that she had purchased a defective home, she sued the agency on grounds that it had not

properly conducted or supervised the inspection. Id. at 290. The Court held that although the plaintiff alleged that she was injured by the government's negligent misrepresentations—conduct expressly immunized by § 2680(h)—her claim could move forward because the injury she alleged was not "wholly attributable to reliance on the Government's misstatements." Id. at 297. Rather, her injury was, at least in part, attributable to other conduct not barred from recovery—the agency's negligent failure to properly inspect the home during construction. Id. at 298. In other words, even if allegations related to the government's misrepresentations were removed from the complaint, the plaintiff could still recover for injuries caused by other government conduct not immunized by the FTCA.

Passantino's claims are different. The linchpin connecting the Committee to Passantino's injury is the defamatory story the Committee allegedly leaked—that Passantino told Hutchinson to lie to the Committee during her interviews. Those allegations cannot form the basis for recovery, and, unlike the plaintiff in Block, Passantino asserts no other tortious act that can form the basis for recovery. When allegations related to the defamatory story are set aside, the only conduct alleged in support of Passantino's invasion of privacy claim is that the government leaked private information related to Passantino's attorney-client relationship with Hutchinson. But neither the Complaint nor any other pleading clarifies what this "private information" is. The only sources that provide even a hint about the

23

substance of the leaked private information are the transcripts of the Committee's interview with Hutchinson and the judicially noticed Reports. But neither contains facts plausibly connecting the Committee's conduct with Passantino's alleged injury.

The transcripts, as alleged in the Complaint, do not contain any information about Passantino or his relationship with Hutchinson that could plausibly cause the types of personal and professional harm he alleges. If anything, the transcripts vindicate Passantino by making clear that he "did not advise [Hutchinson] to lie to the Committee or to perjure herself." Compl. ¶ 59. The judicially noticed Reports are equally vague about the substance of the "private information" the Committee allegedly leaked to the media. The October Report reveals that Liz Cheney talked to Hutchinson behind Passantino's back, encouraged Hutchinson to fire him, and assisted Hutchinson in obtaining new representation, but it does not identify what private information about Passantino the Committee leaked. See October Report, supra note 4.

The December Report only further undermines Passantino's claims by showing that the private information about Passantino the Committee disclosed to the media and in a complaint to the D.C. Bar was, in fact, defamatory. For example, in finding that Cheney and Hutchinson attempted to disbar Passantino, the December Report repeatedly states that the Committee defamed Passantino by "creat[ing] a

narrative that would make Passantino the scapegoat"; "manufactur[ing] the story that Passantino gave Hutchinson faulty advice—such as instructing Hutchinson to withhold information, to misrepresent her testimony, and even that Passantino implied he would help Hutchinson with future employment in return for favorable testimony"; and "accus[ing] Passantino of instructing Hutchinson to lie to congressional investigators, sharing information about her testimony with the press over her objections, sharing information about her testimony with other attorneys, and not disclosing who was paying the bills for her representation." See December Report, supra note 5, at 46–48. Apart from the litany of defamatory remarks, neither Report even hints at what Passantino means by "private information."

Rather, Passantino's injury is "wholly attributable" to the Committee's defamatory statements—conduct expressly immunized by § 2680(h). Block, 460 U.S. at 297. And no reading of the Complaint, even in a light most favorable to Passantino, supports Passantino's argument that his claims are based upon "other independent government action." Cadman, 541 F. App'x at 914. Regardless of how artfully Passantino pleads his claims, he cannot circumvent the inevitability that his suit arises out of defamation—a conclusion that immunizes the United States and leaves this Court without jurisdiction over this case. See Zelaya, 781 F.3d at 1321 ("If there is no specific waiver of sovereign immunity as to a particular claim filed

against the Government, the court lacks subject matter jurisdiction over the suit."). For that reason, his claims are dismissed.

        3.    <u>Failure to State a Claim</u>

As a secondary argument in support of judgment on the pleadings, the United States argues that even if § 2680(h) does not bar Passantino's claims for invasion of privacy and civil conspiracy, those claims still fail to state a claim upon which relief can be granted under D.C. law. The Court again agrees with the United States.

The FTCA extends federal courts jurisdiction to consider only claims in which "the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). Thus, if an FTCA plaintiff fails to plausibly allege all elements of the underlying state law claim, the claim has not been pled "in accordance with the law of the place where the act or omission occurred," and the United States retains sovereign immunity.[10] Id.; <u>see, e.g.</u>, <u>Smith</u>, 14 F.4th at 1231 (holding the court lacked subject matter jurisdiction over an FTCA action because plaintiffs failed to prove the duty element of their underlying state law negligence claim). And with sovereign immunity intact, the court lacks subject matter jurisdiction over the claim. <u>Zelaya</u>, 781 F.3d at 1321. In this way, the merits and jurisdiction of FTCA claims

---

[10] Here, the alleged conduct took place in Washington, D.C., which means D.C. law governs the merits determination of Passantino's claims. <u>See</u> 28 U.S.C. § 1346(b)(1); <u>Smith</u>, 14 F.4th at 1231.

are uniquely "intertwined"—"all elements of a meritorious claim are also jurisdictional." <u>Brownback</u>, 592 U.S. at 217 (cleaned up). Thus, the Court evaluates the merits of each of Passantino's claims to determine whether it retains jurisdiction over them.

### a. *Invasion of Privacy*

Under D.C. law, "[i]nvasion of privacy is not seen as one tort, 'but a complex of four, each with distinct elements and each describing a separate interest capable of being invaded.'"[11] <u>Betz v. Synchrony Bank</u>, No. 22-2235 (JEB), 2023 WL 3303669, at *4 (D.D.C. May 8, 2023) (quoting <u>Wolf v. Regardie</u>, 553 A.2d 1213, 1216–17 (D.C. 1989)). The Parties appear to agree that the specific type of invasion of privacy claim Passantino is alleging is "public disclosure of private facts." [See Docs. 27 at 15; 32 at 13]. To prevail on such a claim, a plaintiff must prove: "(1) publicity, (2) absent any waiver or privilege, (3) given to private facts, (4) in which the public has no legitimate concern, (5) and which would be highly offensive to a

---

[11] D.C. courts have defined those four types of invasion of privacy claims as "(1) intrusion upon one's solitude or seclusion; (2) public disclosure of private facts; (3) publicity that places one in a false light in the public eye; and (4) appropriating one's name or likeness for another's benefit." <u>Wolf v. Regardie</u>, 553 A.2d 1213, 1217 (D.C. 1989).

reasonable person of ordinary sensibilities." <u>Doe v. Bernabei & Wachtel, PLLC</u>, 116

A.3d 1262, 1267 (D.C. 2015) (quoting <u>Wolf</u>, 553 A.2d at 1220).[12]

Here, the Complaint fails to plausibly allege the third, fourth, and fifth

elements. Beginning with the third element, the Complaint does not allege sufficient

details about the "private facts" the Committee allegedly published. While the

Complaint contains no shortage of references to "private facts" and "private

information" about Passantino that the Committee allegedly leaked to the media, it

is virtually silent on what those private facts are. Compl. ¶¶ 2, 34, 53, 69, 70, 72,

82–84, 86, 89. The most Passantino offers about the substance of these facts is that

they relate "to the intimate details of Mr. Passantino's representation of Ms.

Hutchinson." [Doc. 32 at 12–13]. But neither the Complaint nor the Committee

transcripts purportedly containing these "intimate details" shed any light on what the

details are or why they are private. As explained, the transcripts, as alleged in the

Complaint, only serve to vindicate Passantino because they make clear that

Passantino instructed Hutchinson not to lie to the Committee or perjure herself.

---

[12] One important feature of this tort is that it "seeks to redress reputation injuries made all the more painful because the public revelations about deeply private and intimate matters are *undeniably true*." <u>Benz v. Wash. Newspaper Pub. Co.</u>, No. 05-1760 (EGS), 2006 WL 2844896, at *7 (D.D.C. Sept. 29, 2006) (cleaned up and emphasis added) (upholding public disclosure of private facts claim premised the release of plaintiff's true information (e.g., her phone number and address)). This distinction makes sense; after all, facts and falsities are mutually exclusive. Because invasion of privacy requires the disclosure of *true* facts, any allegations in the Complaint that the Committee made *false* statements have no bearing on the plausibility of Passantino's invasion of privacy claim.

Compl. ¶¶ 58–60. The Court is hard pressed to see how an attorney's advice to his client not to lie to Congress is a "private fact" in any sense. Passantino points to only one other potential source of the leaked private information outside the transcripts: "direct conversations between agents of the January 6 Committee and outside third parties." [Doc. 32 at 14]. But yet again, Passantino leaves the United States and this Court guessing as to what private information was exchanged during those conversations.

The Complaint fails as to the fourth element (that the private facts were of no legitimate public concern) and fifth element (that the private facts are highly offensive to a reasonable person of ordinary sensibilities) for the same reason. The Complaint pleads in conclusory fashion that the "public had no interest in the attorney-client relationship between Mr. Passantino and Ms. Hutchinson" and that "[t]he facts disclosed would be offensive to any reasonable person." Compl. ¶¶ 69, 85. But such "[t]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. The Complaint simply does not contain enough facts about the leaked private information for the Court "to infer more than a mere possibility" that the public had no legitimate interest them or that they were highly offensive. Id. at 679.

While the Court agrees with Passantino that he need only plead a short and plain statement to plausibly allege his invasion of privacy claim, the Court disagrees

that Passantino has done so here. Without providing "further factual enhancement," merely reciting the element of a claim is insufficient "to raise a right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 555, 557. Passantino contends that "discovery will bear out the actual facts here," [Doc. 32 at 14], but Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." <u>Iqbal</u>, 556 U.S. at 678–79. Because Passantino offers only unsupported conclusions about the private facts allegedly leaked by the Committee, he fails to state a valid invasion of privacy claim under the FTCA.

### b.    *Civil Conspiracy*

The elements of civil conspiracy consist of: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme. <u>Acosta v. Islamic Republic of Iran</u>, 574 F. Supp. 2d 15, 27 (D.D.C. 2008) (citing <u>Halberstam v. Welch</u>, 705 F.2d 472, 477 (D.C. Cir. 1983)). The "unlawful act" Passantino rests his civil conspiracy claim on is invasion of privacy, which, as explained above, fails as a matter of law. Because the Complaint alleges no other unlawful act, the civil conspiracy claim fails too. <u>See Friends Christian High School v. Geneva Fin. Consultants</u>, 39 F. Supp. 3d 58, 65 (D.D.C. 2014) ("[T]here is no independent action in the District of Columbia for civil conspiracy; rather, it is

a means for establishing vicarious liability for an underlying tort." (quoting <u>Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.</u>, 749 A.2d 724, 738 (D.C. 2000))).

In sum, the United States is entitled to judgment on the pleadings because Passantino's claims arise out of defamation, which 28 U.S.C. § 2680(h) expressly immunizes, and because the Complaint fails to assert all the required elements of invasion of privacy and civil conspiracy. For these reasons, "[t]he sovereign immunity of the United States thus 'remains intact' for the claims brought in this lawsuit and 'no subject matter jurisdiction exists.'" <u>Smith</u>, 14 F.4th at 1234 (quoting <u>Bennett v. United States</u>, 102 F. 3d 486, 488 n.1 (11th Cir. 1996)). And without subject matter jurisdiction, "the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

## V.    Conclusion

For the reasons above, the Court **GRANTS** the United States's construed motion to file an out-of-time Answer [Doc. 21], Motion to Set Aside Entry of Default [Doc. 25], and Motion for Extension of Time [Doc. 43]. The Court also **GRANTS** Passantino's Motions for Judicial Notice [Docs. 39; 42] and **DENIES AS MOOT** his Motion for Default Judgment [Doc. 35]. Additionally, the Court **GRANTS** the United States's Motion for Judgment on the Pleadings [Doc. 27] and **DISMISSES** the Complaint. The Court **DIRECTS** the Clerk to **TERMINATE** this case.

**SO ORDERED**, this 22nd day of January, 2025.

Eleanor L. Ross
United States District Judge
Northern District of Georgia